UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| Sherrill Anderson, Individually and as the Personal Representative of the Estate of Lynn Darryl Anderson, <br><br> Plaintiff, <br><br> v. <br><br> Endo Pharmaceuticals, Inc.; ProStrakan Group, PLC., Actavis, Inc.; Actavis Pharma, Inc. f/k/a Watson Pharma, Inc.; Watson Laboratories, Inc.; and Anda, Inc., <br><br> Defendants. | **COMPLAINT AND DEMAND FOR JURY TRIAL** <br><br><br> Case No.: 1:15-cv-00017 <br> Judge: Paul M. Warner |

## COMPLAINT

Plaintiff Sherrill Anderson, individually and as the personal representative of the Estate of Lynn Darryl Anderson, (hereafter "Plaintiff"), by and through her attorneys, Robert J. DeBry & Associates and Burg Simpson Eldredge Hersh & Jardine, P.C. ("Burg Simpson"), hereby alleges as follows:

## INTRODUCTION

1.     This case involves the prescription drugs Fortesta and Androderm, which are designed, manufactured, sold, distributed and promoted by Defendants Endo Pharmaceuticals, Inc. and ProStrakan Group, PLC. and Actavis, Inc., Actavis Pharma, Inc. f/k/a Watson Pharma, Inc., Watson Laboratories, Inc., and Anda, Inc. (hereinafter jointly "Defendants") as a testosterone replacement therapy.

2.     Defendants misrepresented that testosterone replacement with Fortesta and Androderm was a safe and effective treatment for hypogonadism and/or what Defendants describe as "low testosterone," when in fact these drugs cause serious medical problems, including life threatening cardiac events, strokes, and thromboembolic events.

3.     Fortesta and Androderm are an exogenous form of the androgen testosterone. They regulate the expression of platelet $TXA_2$ receptors in humans, which significantly increases platelet aggregation.  Testosterone replacement therapies (hereinafter TRT) such as Fortesta and Androderm cause an increase in hematocrit and estradiol in adult males, resulting in thickened blood, the development of blood clots, and heart damage. These effects, if not monitored and controlled properly, can lead to life threatening cardiac events, strokes and thromboembolic events, including but not limited to deep vein thrombosis, pulmonary embolism, transient ischemic attacks, ischemic stroke, and numerous types of cardiovascular injuries.

4.     Fortesta is delivered transdermally and is applied to the skin in the form of a gel; Androderm is also delivered transdermally and is applied to the skin in the form of a patch.

5.     Defendants failed to adequately warn physicians about the risks associated with the Fortesta and Androderm and the monitoring required to ensure their patients' safety.

6.     Defendants engaged in aggressive, award-winning direct-to-consumer and physician marketing and advertising campaigns for Fortesta and Androderm.   Further, Defendants engaged in an aggressive unbranded "disease awareness" campaign to alert men that they might be suffering from "low testosterone" or "Low T," which was ultimately designed to over-promote and sell their testosterone replacement therapies.

7.     According to the industry-leading Androgen Deficiency in Adult Males ("ADAM") or "Is it Low T?" quiz, the symptoms of "Low T" include being "sad or grumpy,"

"experiencing deterioration in the ability to play sports," and "falling asleep after dinner." *Available at:* http://www.isitlowt.com/do-you-have-low-t/low-t-quiz. Most doctors agree that these symptoms can be caused by an abundance of factors, the most prominent of which is the natural aging process.

8.    The FDA has not approved any testosterone replacement therapy drug as a treatment for low testosterone or "Low T." Additionally, low testosterone is not a disease recognized by the medical community. Instead, it is a normal result of the aging process experienced by the majority of males.

9.    As a result of Defendants' "disease mongering," as termed by Dr. Adriene Fugh-Berman of Georgetown University Medical Center, diagnoses of "Low T" have increased exponentially. This has directly related to increases in testosterone replacement therapy products sales to over $200 million per year.

10.    However, consumers of testosterone products and their physicians were misled by Defendants as to the drug's safety and efficacy, and as a result many consumers have suffered injuries including life-threatening cardiac events, strokes, and thromboembolic events.

## PARTIES

11.    Plaintiff Sherrill Anderson is an individual residing in Davis County, State of Utah. Plaintiff is a surviving spouse of decedent, Lynn Darryl Anderson ("Decedent") and the duly appointed personal representative of Decedent's estate. Plaintiff brings this action on her own behalf, as a wrongful death beneficiary, and on behalf of Decedent's other wrongful death beneficiaries, including Aaron Lynn Anderson, Adam Brian Anderson, and Alan Cameron Anderson.

3

12.     Decedent, Lynn Darryl Anderson began using the prescription drug Fortesta on or about August 2012 and used it as directed until September 4, 2012, at which time he suffered an acute ischemic stroke resulting in injuries resulting in his death on January 21, 2013.

**Defendants Endo Pharmaceuticals, Inc. and ProStrakan Group, Plc.**

13.     Defendant Endo Pharmaceuticals Inc. is a corporation organized and existing under the laws of Delaware with its principal place of business at 1400 Atwater Drive, Malvern Pennsylvania, 19355.

14.     At all times herein mentioned, Endo Pharmaceuticals Inc. researched, developed, marketed, distributed and sold pharmaceutical products including Fortesta, and was the holder of the exclusive right to commercialize Fortesta in the United States of America.

15.     Defendant ProStrakan Group, Plc. is a United Kingdom company with a place of business and representative in the United States of America located at 685 Route 202/206, Suite 101, Bridgewater, New Jersey 08807.

16.     At all times herein mentioned, Defendant ProStrakan Group, Plc. was engaged in the research, development, sales and marketing of pharmaceutical products including Fortesta.

17.     At all times herein mentioned, Defendants advertised, promoted, supplied, and sold to distributors and retailers for resale to physicians, hospitals, medical practitioners, and the general public a certain pharmaceutical product Fortesta in this judicial district, in the State of Utah, and in interstate commerce.

**Defendants Actavis, Inc.; Actavis Pharma, Inc. f/k/a Watson Pharma, Inc.; Watson Laboratories, Inc.; and Anda, Inc.**

18.     At all times herein mentioned, Androderm is manufactured by Defendant Watson Laboratories, Inc. and is distributed by Watson Pharma, Inc.

4

19.    By way of background, Watson Pharmaceuticals, Inc. previously acquired the original manufacturer of Androderm®, TheraTech, Inc., in 1999. Watson Pharmaceuticals, Inc. later acquired the Actavis Group in 2012 and announced shortly thereafter that, as of January 2013, it had changed its corporate name to Actavis, Inc. Watson Pharmaceuticals, Inc.'s subsidiaries and affiliates similarly changed their names, and in 2013, Watson Pharma, Inc. changed its name to and became Actavis Pharma, Inc.

20.    Defendant Actavis Pharma, Inc., formerly known as Watson Pharma, Inc., is a domestic corporation organized and existing under the laws of the state of Delaware and maintains its principal place of business at Morris Corporate Center III, 400 Interpace Parkway, Parsippany, New Jersey 07054. At all relevant times herein, Defendant Actavis Pharma, Inc. was engaged in the research, development, design, manufacture, sales, marketing, and/or distribution of pharmaceutical products, including Androderm® in the State of Utah and is therefore subject to the jurisdiction and venue of the State of Utah. The current registered agent is CT Corporation System located at 1108 East South Union Ave., Midvale, UT 84047. Actavis Pharma, Inc. has conducted business and derived substantial revenue from within the State of Utah.

21.    Defendant Watson Laboratories, Inc., is a domestic corporation organized and existing under the laws of the State of Delaware. They currently maintain their principal place of business at Morris Corporate Center III, 400 Interpace Parkway, Parsippany, New Jersey 07054. At all relevant times herein, Defendant Watson Laboratories, Inc., a subsidiary of Actavis, Inc., was engaged in the research, development, design, manufacture, sales, marketing, and/or distribution of pharmaceutical products, including Androderm® in the State of Utah and is therefore subject to the jurisdiction and venue of the State of Utah. The current registered agent

is CT Corporation System located at 1108 East South Union Ave., Midvale, UT 84047. Watson Laboratories, Inc. has conducted business and derived substantial revenue from within the State of Utah.

22.     Defendant Actavis, Inc. is a corporation organized and existing under the laws of the State of Nevada with its principal place of business and its headquarters located at Morris Corporate Center III, 400 Interpace Parkway, Parsippany, New Jersey 07054. On information and belief, Defendant Actavis, Inc. is a wholly owned subsidiary of its parent corporation Actavis, Plc, which is incorporated and located in Ireland. Defendant Actavis, Inc. is the North American arm of Actavis, Plc and is the parent company of Defendant Watson Laboratories, Inc. and Defendant Actavis Pharma, Inc. (f/k/a as Watson Pharma, Inc.). At all relevant times herein, Actavis, Inc. was engaged in the research, development, design, manufacture, sales, marketing, and/or distribution of pharmaceutical products, including Androderm® in the State of Utah and is therefore subject to the jurisdiction and venue of the State of Utah. Actavis, Inc. has conducted business and derived substantial revenue from within the State of Utah. There is no registered agent for Actavis, Inc. in the State of Utah. Actavis, Inc. can be served by delivering the Complaint to its current registered agent for service The Corporation Trust Company of Nevada, 311 S. Division St., Carson City, NV 89703. Actavis, Inc. has conducted business and derived substantial revenue from within the State of Utah.

23.     Defendant Anda, Inc. is a domestic corporation organized and existing under the laws of the State of Florida and maintains its principal place of business at 2915 Weston Road, Weston, Florida, 33331. At all relevant times herein, Defendant Anda, Inc., a subsidiary of Actavis, Inc., was engaged in the research, development, manufacture, sales, marketing, and/or distribution of pharmaceutical products, including Androderm® in the State of Utah and is

6

therefore subject to the jurisdiction and venue of the State of Utah. The current registered agent is CT Corporation System located at 1200 South Pine Island Rd, Plantation, FL 33324. Anda, Inc. has conducted business and derived substantial revenue from within the State of Utah.

24.     At all times herein mentioned, Defendants advertised, promoted, supplied, and sold to distributors and retailers for resale to physicians, hospitals, medical practitioners, and the general public a certain prescription testosterone replacement product in this judicial district, in the State of Utah, and in interstate commerce.

## JURISDICTION AND VENUE

25.     This Court has jurisdiction over Defendants and this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiffs and Defendants and because the amount in controversy between Plaintiffs and Defendants exceeds $75,000, exclusive of interest and costs, and because, among other reasons, Defendants have significant contacts with this district by virtue of doing business within this judicial district.

26.     Venue in this action properly lies in this judicial district pursuant to 28 U.S.C. §1391(b) (2), because a substantial number of events, actions or omissions giving rise to plaintiff's claims occurred in the State of Utah and this District.

## GENERAL ALLEGATIONS

27.     This action is for damages brought on behalf of Decedent Lynn Darryl Anderson who was prescribed and supplied with, received and who took and applied the prescription drug Fortesta and Androderm as tested, studied, researched, evaluated, endorsed, designed, formulated, compounded, manufactured, produced, processed, assembled, inspected, distributed, marketed, labeled, promoted, packaged, advertised for sale, prescribed, sold or otherwise placed in the stream of interstate commerce by Defendants. This action seeks, among other relief,

7

general and special damages and equitable relief for the injuries caused by the wrongful death of Decedent, Lynn Darryl Anderson, and for the loss of society and consortium suffered by Plaintiff Sherrill Anderson and the wrongful death heirs.

28.　　Defendants' wrongful acts, omissions, and fraudulent misrepresentations caused Decedent to suffer an acute ischemic stroke resulting in his untimely death on January 21, 2013 from ischemic encephalopathy that was a sequel of the ischemic stroke.

29.　　At all times herein mentioned, the Defendants were engaged in the business of, or were successors in interest to, entities engaged in the business of research, licensing, designing, formulating, compounding, testing, manufacturing, producing, processing, assembling, inspecting, distributing, marketing, labeling, promoting, packaging and/or advertising for sale or selling the prescription drug Fortesta and Androderm for the use and application by men, including, but not limited to, Decedent.

30.　　At all times herein mentioned, Defendants were authorized to do business within the State of Utah and Plaintiff's injuries arose within the State of Utah.

31.　　At all times herein mentioned, the officers and directors of Defendants participated in, authorized, and directed the production and promotion of the aforementioned product when they knew, or with the exercise of reasonable care should have known, of the hazards and dangerous propensities of said product and thereby actively participated in the tortious conduct which resulted in the injuries to the Plaintiff herein.

## **Regulatory History and Approved Uses**

32.　　Testosterone is a primary androgenic hormone responsible for normal growth, development of the male sex organs, and maintenance of secondary sex characteristics.

33.　　The hormone plays a role in sperm production, fat distribution, maintenance of muscle strength and mass, and sex drive.

34. In men, testosterone levels normally begin a gradual decline after the age of thirty.

35. The average testosterone levels for most men range from 300 to 1,000 ng/dl of blood. However, testosterone levels can fluctuate greatly depending on many factors, including sleep, time of day, and medication. Resultantly, many men who may have testosterone levels below 300 ng/dl on one day will have normal testosterone levels the next. Additionally, testosterone levels gradually decline as men age. This decline in serum testosterone levels is a normal process that does not represent a medical condition or disease.

36. The Food and Drug Administration approved Fortesta and Androderm for the treatment of adult males who have low or no testosterone (a condition called Hypogonadism) in conjunction with an associated medical condition. Examples of these conditions include failure of the testicles to produce testosterone for reasons such as genetic problems or chemotherapy. After FDA approval, Defendants widely advertised and marketed by their testosterone replacement products as safe and effective testosterone replacement therapy.

37. Hypogonadism is a specific and recognized condition of the endocrine system, which in men may involve the severely diminished production or nonproduction of testosterone. Primary hypogonadism occurs under circumstances of congenital or acquired pathologic insults to and conditions of the testes in men. Secondary hypogonadism occurs under the circumstances of hypogonadotropism, including hypothalamic-pituitary diseases and disorders and other conditions, which cause suppression of gonadotropin-releasing hormone (GnRH).

38. In 1999, when Unimed Pharmaceuticals Inc., the original company seeking FDA approval of TRT drug, asserted that hypogonadism was estimated to affect approximately "one million American men." The company represented to the FDA that it would market and sell the

drug to this patient population of one million men who have an actual diagnosis of hypogonadism with associated medical condition. This was a false representation that the company made to the FDA in order to obtain approval of the drug. Defendants have adopted and continue to promote this false representation.

39.     In 2000, when the FDA approved testosterone replacement therapy, the company announced that the market had increased from one million men to "four to five million American men." By 2003, the number again increased to "up to 20 million men." However, a study published in the Journal of the American Medical Association ("JAMA") in August 2013 entitled "Trends in Androgen Prescribing in the United States, 2001-2011" indicated that many men who get testosterone prescriptions have no evidence of hypogonadism. For example, one third of men prescribed testosterone had a diagnosis of fatigue, and one quarter of men did not even have their testosterone levels tested before they received a testosterone prescription.

40.     Additionally, a Canadian study showed that only about 6.3% of men who were prescribed testosterone actually met the diagnostic criteria for hypogonadism.

41.     At all times material hereto, and since the time that Defendants' testosterone replacement therapy drugs first received approval from the FDA, Defendants knew and understood the FDA-approved indications for clinical use of their product.

### Direct to Consumer Marketing and Promotion to Physicians for Unbranded/Off-Label Use

42.     Defendants expanded the indications for use by promoting and detailing "Low T" as an acquired form of hypogonadism, and advantaged intentional ambiguity in the product labeling as a basis for "label expansion" and "off-label" marketing, detailing, and promotion to physicians.

43.     Since the FDA approved testosterone replacement therapy for a very specific medical condition called Hypogonadism, Defendants have also sought to convince primary care physicians that Hypogonadism is synonymous with "Low T" and that low testosterone levels are widely underdiagnosed, and that normal and common conditions associated with normal aging could be caused by low testosterone levels.

44.     Defendants convinced millions of men to discuss testosterone replacement therapy with their doctors, and consumers and their physicians relied on Defendants' promises of safety and ease. Although prescription testosterone replacement therapy had been available for years, millions of men who had never been prescribed testosterone flocked to their doctors and pharmacies.

45.     The Defendant manufactured, sold and promoted the drug to treat a non-existent medical condition that it called "LowT," which was a name it created for the constellation of symptoms experienced by men as a result of the normal aging process.  In essence, the Defendants marketed and sold testosterone as a lifestyle drug meant to make men feel younger and increase libido.

46.     As observed by Lisa M. Schwartz, M.D., M.S. and Steven Woloshin, M.D., M.S. in their article "Low T as a Template: How to Sell Disease" published in JAMA Internal Medicine 173(15):1460-1462 (August 12/26, 2013) concerning the "Low T" campaigns by the pharmaceutical industry:

> Whether the campaign is motivated by a sincere desire to help men
> or simply by greed, we should recognize it for what it is: a mass,
> uncontrolled experiment that invites men to expose themselves to
> the harms of a treatment unlikely to fix problems that may be
> wholly unrelated to testosterone levels.
>
> We agree with Braun that there is a strong analogy between the
> marketing of testosterone therapy for men and estrogen therapy for

menopausal women. Ignoring the lessons of estrogen therapy is scandalous. Before anyone makes millions of men aware of Low T, they should be required to do a large-scale randomized trial to demonstrate that testosterone therapy for healthy aging men does more good than harm.

47.     Defendants' advertising paid off in an exponential increase of sales. Sales of testosterone replacement therapies have more than doubled since 2006, and are expected to triple to $5 billion by 2017, according to forecasts by Global Industry Analysts. Shannon Pettypiece, *Are Testosterone Drugs the Next Viagra?*, May 10, 2012, Bloomberg Businessweek, *available at:* http://www.businessweek.com/articles/2012-05-10/are-testosterone-drugs-the-next-viagra.

48.     The Defendants engaged in aggressive promotion to physicians that testosterone replacement therapy could be used as a lifestyle drug to treat conditions such as erectile dysfunction. Sales representatives were instructed to tell physicians that if a patient requested medication for erectile dysfunction the physician should first test the patient's testosterone level to determine if the cause of the erectile dysfunction was "LowT."

49.     The marketing program sought to create the image and belief by consumers and physicians that low testosterone affected a large number of men in the United States, and that the use of testosterone replacement therapy drugs, such as Fortesta and Androderm, were safe for human use as a treatment for "Low T," even though Defendants knew these to be false, and even though Defendants had no reasonable grounds to believe them to be true.

50.     At all times material hereto, Defendants' marketing strategy included the use of sales or drug detailing representatives ("Reps") and marketing and brand team personnel who performed on-line and in-person testosterone replacement therapy product detailing to physicians; and also promotional and detailing to healthcare providers and physicians at medical

organization and society meetings and conventions via display booths, sponsored meeting sessions and "satellite" sessions, and sponsored medical speakers.

51.    Defendants' drug detailing "reps" provided physicians and healthcare providers with information and literature concerning the indications for clinical use of testosterone replacement therapy drugs, such as Fortesta and Androderm, as well as discount and/or rebate coupons to give to patients for the purchase of the products.

52.    Defendant's drug "reps" detailed and marketed their testosterone replacement therapy products to physicians as products approved and indicated for the treatment of age-related declines in testosterone levels and age-related symptoms.

53.    Defendants denominated and characterized age-related declines in testosterone levels and age-related symptoms in men as "Low T," and used the "Low T" moniker to denote and connote that the presence of age-related declines in testosterone levels and age-related symptoms in men were a form of acquired hypogonadism.

54.    The Defendants knew and understood the meaning of the terms "off-label" and "label expansion."

55.    The Defendants knew and understood the FDA regulations pertaining to "off-label" marketing and promotion of an FDA-approved pharmaceutical product.

56.    Defendants marketed, promoted, and detailed testosterone replacement therapy for "off-label" use for the purpose of "label expansion," and detailed and promoted the product to physicians, and advertised the product to consumers and patients, under the rubric that "Low T" was an indication for clinical use of the product.

57.    A manufacturer may not introduce a drug into interstate commerce with an intent that it be used for an "off-label" purpose.

13

58.    A manufacturer misbrands a drug if the labeling, or any of the manufacturer's promotional and advertising materials, describe an intended use for the drug that has not been approved by the FDA.

59.    Promotional materials are misleading if they suggest that a drug is useful in the treatment of a broader range of conditions, or in a broader population of patients, than has been demonstrated by substantial evidence or substantial clinical experience.

60.    Promotional materials are misleading if they represent or suggest that a drug is more effective than has been demonstrated by substantial evidence or substantial clinical experience.

61.    Promotional materials are misleading if they fail to reveal facts that are material in light of the representations made, or with respect to the consequences that may result from the use of the drug as recommended or suggested by the materials.

62.    The FDA did not, and never has, approved Defendant testosterone replacement therapy products for the treatment of:

      a.    age-related declines in testosterone levels in men;

      b.    age-related symptoms;

      c.    mood disorders, including depression or "grumpiness" or inability to concentrate;

      d.    lack of sexual interest or decreased libido;

      e.    disorders of erectile function or erectile dysfunction;

      f.    loss of muscle mass; or,

      g.    bone strength or density abnormalities.

14

## Adverse Events and Serious Health Risks
## Caused by Testosterone Replacement Therapy ("TRT")

63. There have been a number of recent studies associating testosterone use in men with an increased risk of serious injuries from blood clots and cardiovascular events.

64. Testosterone replacement therapy involves the administration of exogenous testosterone into the male body in an attempt to raise the serum level of total testosterone. This is achieved through the application of a cream, gel or patch directly to the skin for transdermal absorption into the body. It can also be delivered into the body by subcutaneous injection or placement of a time-released pellet containing the drug.

65. The absorption of exogenous testosterone into the male body can cause an increase in serum levels of testosterone, and it also results in an increase in hematocrit[1] and serum estradiol levels.[2] It can also cause increased platelet aggregation and vasoconstriction.

66. Hematocrit is the proportion of total blood volume that is comprised of red blood cells. Erythrocytosis is an increase in the number of circulating red blood cells especially resulting from a known stimulus (like Testosterone). When a person's hematocrit level is raised through erythrocytosis, the resulting condition is called polycythemia, which simply means an elevated red blood cell count. The range for normal hematocrit levels in adult males is 44%-48%.

67. The administration of exogenous testosterone causes a 7%-10% increase in hematocrit levels in adult males through the process of erythrocytosis.[3] An increase of

---

[1] Fernandez-Balsells, M., et al., Adverse Effects of Testosterone Therapy in Adult Men: A Systematic Review and Meta-Analysis. J Clin Endocrinol Metab, June 2010, 95(6):2560–2575.

[2] Finkelstein, JS, et al., Gonadal Steroids and Body Composition, Strength, and Sexual Function in Men. N Engl J Med 2013;369:1011-22.

[3] Bachman, E., et al. Testosterone Induces Erythrocytosis via Increased Erythropoietin and Suppressed Hepcidin: Evidence for a New Erythropoietin/Hemoglobin Set Point. J Gerontol A Biol Sci Med Sci., 2013.

hematocrit that is 7%-10% above normal range is a significant elevation and qualifies as polycythemia. This is a serious medical condition that requires treatment to prevent injury.

68.     The clinical trial data submitted to the FDA for the approval of AndroGel showed that the use of exogenous testosterone resulted in nine percent of subjects experiencing hematocrit levels greater than 56% at some point during the study. A hematocrit level of 56% is significantly elevated above the normal range and qualifies as polycythemia. This is a level that puts the patient at serious risk for an adverse health consequence and requires immediate treatment and/or cessation of the testosterone therapy.

69.     Elevated hematocrit is an independent risk factor for stroke and it interacts synergistically with elevated blood pressure. In a published study[4] the cohort for men with a hematocrit level greater than or equal to 51% had a more than doubling of the risk of stroke (RR=2.5), and among males in the cohort who were also hypertensive there was a nine-fold increase in the risk of stroke for those with hematocrit greater than or equal to 51%.

70.     Elevated hematocrit is also an independent risk factor for adverse cardiovascular events. Using data from the Framingham Heart Study, researchers documented a strong, graded relationship between hematocrit level and the risk of developing heart failure. In 3,523 Framingham participants, aged 50-65, who were free of a history of heart failure at baseline and were followed prospectively for up to 20 years, individuals with a hematocrit level greater than or equal to 50% had almost double the risk of new-onset heart failure during follow-up,

---

[4] Wannamethee G1, Perry IJ, Shaper AG, Hematocrit, hypertension and risk of stroke. J Intern Med. 1994 Feb;235(2):163-8.

compared with those with a low hematocrit, even after adjustment for conventional risk factors for heart failure.[5]

71.    In another study of 680 males conducted over 28 years in Finland, the data showed that men with a hematocrit level greater than or equal to 50% were 2.4 times more likely to die from coronary heart disease than men with hematocrit levels of less than 50%. Even after adjusting for established coronary risk factors, the increased risk remained 1.8-fold for the higher hematocrit cohort.[6]

72.    In yet another large, prospective study[7] in Norway, the data show a hazard ratio of 1.25 per 5% rise in hematocrit. In a category-based analysis, a hematocrit level in the upper 20th percentile was found to be associated with a 1.5-fold increased risk of venous thrombosis, and a 2.4-fold increased risk of unprovoked venous thromboembolism compared to men whose hematocrit was in the lower 40th percentile.

73.    An increase in the level of hematocrit also causes an increase in the viscosity of the blood. A 10.99% increase of hematocrit produces an increase of 1 unit relative viscosity, which means approximately a 20% increase in blood viscosity for a healthy individual.[8] An increase in blood viscosity is a known risk factor for ischemic heart disease,[9] and it can cause hypertension as blood pressure increase will be 20% or vasodilation will be 4.66% in radius for

---

[5] Coglianese, E., et al., Usefulness of the Blood Hematocrit Level to Predict Development of Heart Failure in a Community. Am J Cardiol. Jan 15, 2012; 109(2): 241–245. Published online Oct 12, 2011

[6] Kunnas, T, et al., Hematocrit and the risk of coronary heart disease mortality in the TAMRISK study, a 28-year follow-up. Prev. Med. Volume 49, Issue 1, July 2009, Pages 45–47.

[7] Braekkan SK, Mathiesen EB,et al., Hematocrit and risk of venous thromboembolism in a general population. The Tromso study. Haematologica. 2010 Feb; 95(2):270-5.

[8] Cinar, Y., et al., Effect of hematocrit on blood pressure via hyperviscosity. Am J Hypertens. 1999 Jul;12(7):739-43.

[9] Yarnell, JW, et al., Fibrinogen, viscosity, and white blood cell count are major risk factors for ischemic heart disease. The Caerphilly and Speedwell collaborative heart disease studies. Circulation. 1991 Mar;83(3):836-44.

the physiologic compensation of 20% increased viscosity. Hypertension is a known cause of atherosclerosis, heart failure, and stroke. Testosterone makes blood thick and viscous, which, in turn, can cause numerous health risks and injuries for patients.

74.     The major source of estradiol in men comes from the aromatization of testosterone (endogenous and/or exogenous) to estradiol. When men are given testosterone, either by application of an androgen gel or by injection, some of that testosterone is converted by the body (aromatized) to estradiol.[10] The increase of estradiol is in direct relation to the amount of the dose of exogenous testosterone delivered; the higher the dose of testosterone, the higher the level of serum estradiol.[11]

75.     In data gathered from 2,197 men who participated in the Honolulu Aging Study from 1991-1993, and who were followed for thromboembolic and hemorrhagic events until 1998, there was a two-fold excess risk of stroke for men who had serum estradiol levels in the top quintile versus those men whose estradiol levels were lower.[12] This study revealed that estradiol blood levels greater than 34.1 pg/mL resulted in this more than doubling of stroke incidence. As a source of embolism, the authors noted that the prevalence of atrial fibrillation rose significantly from 1.0 to 4.4% from the bottom to the top estradiol quintiles. Atrial fibrillation is a known cause of thrombus formation.

76.     If men have an underlying inherited trait which increases their risk of blood clotting, particularly the Factor V Leiden mutation, the Prothrombin gene mutation, high Factor VIII, high homocysteine, or the lupus anticoagulant, then the estradiol can

---

[10] Glueck, CJ, et al., Thrombotic events after starting exogenous testosterone in men with previously undiagnosed familial thrombophilia. Trans. Res. Oct. 2011.

[11] Finkelstein, JS, et al., Gonadal Steroids and Body Composition, Strength, and Sexual Function in Men. N Engl J Med 2013;369:1011-22.

[12] Abbott, RD, et al., Serum Estradiol and Risk of Stroke in Elderly Men. Neurology 2007, 68:563-568.

interact with the underlying clotting trait to produce blood clots in the legs, the lungs, the eyes, the brain, and the bones.[13]

77. In a study published in 2006, blood levels of estradiol were measured in 313 men whose average age was 58. Carotid artery intima-media thickness was measured at baseline and then three years later. After adjusting for other risk factors, men with higher levels of estradiol suffered a worsening thickening of their carotid artery wall. This led the researchers to conclude, "circulating estradiol is a predictor of progression of carotid artery intima-media thickness in middle-aged men."[14] These findings of a positive association between serum estradiol levels and intima-media thickening supports the notion that estrogens, besides possibly increasing the risk for thrombosis and thereby cardiovascular events, also have an important impact on atherogenesis (the formation of atheromas or plaque in the arterial walls) in men.

78. In a case control study of men in the Framingham cohort *supra*, serum estradiol levels were significantly increased in subjects with coronary heart disease.[15]

79. Estradiol has a greater effect in the male heart through the regulation of gene expression than it does in female hearts. This effect results in impaired contractile function of the heart in males with elevated levels of serum estradiol. [16] Impaired contractile function results in numerous cardiovascular injuries and disease.

---

[13] Glueck, CJ, et al., Testosterone, thrombophilia, thrombosis. Blood Coagulation and Fibrinolysis 2014, 25:00–00.

[14] Tivesten, A., et al., Circulating Estradiol is an Independent Predictor of Progression of Carotid Artery Intima-Media Thickness in Middle-Aged Men, J CLIN ENDOCRINOL METAB, November 2006, 91 (11): 4433-4437.

[15] Phillips GB, Castelli WP, Abbott RD, et al., Association of Hyperestrogenemia and Coronary Heart Disease in Men in the Framingham Cohort, Am J Med, 1983 74:863-869.

[16] Kararigas, G., et al., Transcriptome Characterization of Estrogen-Treated Human Myocardium Identifies Myosin Regulatory Light Chain Interacting Protein as a Sex-Specific Element Influencing Contractile Function, JACC Vol. 59, No. 4, January 24, 2012, 2012:410-7.

80.    A study published in 2007 compared blood levels of testosterone and *estradiol* in men suffering acute myocardial infarction (heart attack) with those who had previously suffered a heart attack. Sex hormones were measured in patients presenting with acute heart attack, patients with old heart attack, and patients with normal coronary arteries. The results showed significantly higher levels of *estradiol* in both groups of heart attack patients compared with those without coronary disease.[17]    In another study, men were admitted to the hospital with acute heart attacks whose levels of sex hormones were evaluated. Compared with control patients, *estradiol* levels in these heart attack patients were **180%** higher, while bioavailable testosterone levels were **nearly three times less** than those of control patients.[18]

81.    High testosterone levels also enhance acute myocardial inflammation, adversely affecting myocardial healing and early remodeling, as indicated by increased cardiac rupture, and possibly causing deterioration of cardiac function after myocardial infarction ("MI"), and, conversely, estrogen seems to have no significant protective effect in the acute phase after MI.[19]

82.    Thromboxane A2 (TXA2) is a vasoconstrictor and platelet pro-aggregatory agent that has been implicated in the pathogenesis of cardiovascular disease. Thromboxane A2 has been unequivocally implicated in a range of cardiovascular diseases, owing to its acute and chronic effects in promoting platelet aggregation, vasoconstriction and proliferation. A study published in 1995 demonstrated that testosterone treatment was associated with a significant

---

[17] Mohamad MJ, Mohammad MA, Karayyem M, Hairi A, Hader AA. Serum levels of sex hormones in men with acute myocardial infarction. Neuro Endocrinol Lett. 2007 Apr;28(2):182-6.

[18] Pugh PJ, Channer KS, Parry H, Downes T, Jone TH. Bio-available testosterone levels fall acutely following myocardial infarction in men: association with fibrinolytic factors. Endocr Res. 2002 Aug;28(3):161-73.

[19] Maria A. Cavasin , Zhen-Yin Tao , Ai-Li Yu , Xiao-Ping Yang; American Journal of Physiology - Heart and Circulatory Physiology Published 1 May 2006Vol. 290no. H2043-H2050DOI: 10.1152/ajpheart.01121.2005

increase in the maximum platelet aggregation response and this effect may contribute to the thrombogenicity of androgenic steroids like testosterone.[20]

83.     In 2010, a New England Journal of Medicine Study entitled "Adverse Events Associated with Testosterone Administration" was discontinued after an exceedingly high number of men in the testosterone group suffered adverse events.

84.     In November of 2013, a JAMA study was released entitled "Association of Testosterone Therapy with Mortality, Myocardial Infarction, and Stroke in Men with Low Testosterone Levels," in which a large cohort of men who used testosterone taken from a database of the Veteran's Administration was compared against a cohort of men who did not use testosterone. The data showed that among the cohort who used testosterone, the testosterone therapy raised the risk of death, heart attack and stroke by about 30%.

85.     On January 29, 2014, a study was released in PLOS ONE entitled "Increased Risk of Non-Fatal Myocardial Infarction Following Testosterone Therapy Prescription in Men" which indicated that testosterone use doubled the risk of heart attacks in men over sixty five years old and men younger than sixty five with a comorbid condition. The conclusion of this published study was that the risk of myocardial infarction following initiation of testosterone therapy prescription is substantially increased.

86.     In a study published in 2013[21], based on a systematic review and meta-analysis of placebo-controlled randomized trials of testosterone therapy among men lasting 12 or more weeks reporting cardiovascular-related events, two reviewers independently searched, selected

---

[20] Ajayi, A., et al., Testosterone Increases Human Platelet Thromboxane A2 Receptor Density and Aggregation Responses. Circulation. 1995; 91: 2742-2747.

[21] Xu, L., et al., Testosterone therapy and cardiovascular events among men: a systematic review and meta-analysis of placebo-controlled randomized trials. BMC Medicine 2013, 11:108.

and assessed study quality with differences resolved by consensus. Additionally, two statisticians independently abstracted and analyzed data, and concluded that testosterone therapy increased the risk of a cardiovascular-related event. Their meta-analysis of the published literature also showed that the effect of testosterone therapy varied with source of funding. In trials not funded by the pharmaceutical industry the risk of a cardiovascular-related event on testosterone therapy was greater than in pharmaceutical industry funded trials. The study concluded that the existing body of published medical literature demonstrates that in trials not funded by the pharmaceutical industry, exogenous testosterone increased the risk of cardiovascular-related events, with corresponding implications for the use of testosterone therapy.

87.    In some patient populations, testosterone use can increase the incidence of adverse events and death by over 500%.

### Inadequate Warnings and Labeling

88.    Defendants' marketing strategy beginning in 2000 has been to aggressively market and sell their products by misleading potential users and their physicians about the prevalence and symptoms of low testosterone and by failing to protect users from serious dangers that Defendants knew or should have known to result from use of its products.

89.    Defendants successfully marketed Testosterone replacement therapy by undertaking a "disease awareness" marketing campaign. This campaign sought to create a consumer perception that low testosterone is prevalent among U.S. men and that symptoms previously associated with other physical and mental conditions, such as aging, stress, depression, and lethargy were actually attributable to "Low T."

90.    Defendant's advertising program, sought to create the image and belief by consumers that the use of Testosterone replacement therapy was a safe method of alleviating

their symptoms, had few side effects and would not interfere with their daily lives, even though Defendants knew or should have known these to be false, and even though the Defendants had no reasonable grounds to believe them to be true.

91.    Defendants promoted and marketed testosterone replacement therapy to physicians as a lifestyle drug that could treat a variety of symptoms caused by the normal aging process in males, including: erectile dysfunction; loss of libido; loss of athleticism; loss of muscle mass; fatigue; and mood swings. Defendants overstated the benefits of testosterone as a treatment for lifestyle changes associated with the aging process despite the fact that the drug was never FDA approved for these uses.

92.    Defendants purposefully downplayed, understated and outright ignored the health hazards and risks associated with using Testosterone replacement therapy . Defendants deceived potential Testosterone replacement therapy users and their physicians by relaying positive information through the press, including Testimonials from retired professional athletes, and manipulating the definition of hypogonadism and statistics of its occurrence in men to suggest widespread disease prevalence, while downplaying known adverse and serious health effects.

93.    Defendants concealed material relevant information from potential Testosterone replacement therapy users, and their physicians, and minimized user and prescriber concern regarding the safety of Testosterone replacement therapy, including but not limited to its known propensity to drastically increase hematocrit and estradiol in users.

94.    In particular, in the warnings Defendants provided in their commercials, online and print advertisements, Defendants failed to mention any potential risk of cardiac event, stroke, pulmonary embolism or other dangerous side effects related to blood clotting and falsely represent that the Defendants adequately tested their testosterone replacement therapy products

(Fortesta and Androderm ) for all likely side effects. The Defendants also failed to warn and instruct regarding the importance of adequate monitoring of hematocrit and estradiol levels.

95. At the time Plaintiff used Fortesta and Androderm, the prescribing information and medication guide contained within the package materials did not warn against stroke, pulmonary embolism, transient ischemic attack, cardiovascular disease, myocardial infarction, coronary heart failure, or any thromboembolic event not related to polycythemia.

96. The medication guide contained within the package materials instructed patients to tell their healthcare provider whether they have any of the following conditions before initiating use of testosterone replacement therapy :

- have breast cancer

- have or might have prostate cancer

- have urinary problems due to an enlarged prostate

- have heart problems

- have kidney or liver problems

- have problems breathing while you sleep (sleep apnea)

- have any other medical conditions

However, the prescribing information and medication guide contained within the package materials failed to instruct patients to tell their healthcare provider if they have an underlying inherited trait which increases their risk of blood clotting, particularly the Factor V Leiden mutation, the Prothrombin gene mutation, high Factor VIII, high homocysteine, or the lupus anticoagulant. They also failed to instruct patients or physicians to be aware of the presence of comorbid conditions or pre-existing heart disease, which has been proven to double the risk in men under the age of 65 who use testosterone therapy.

24

97.    Although the prescribing information and medication guide contained within the package materials warned that the use of the product may result in increased red blood cell count, they did not instruct physicians or patients that the product can increase a red blood cell count to the point that it more than doubles the risk for stroke, pulmonary embolism, ischemic heart disease, coronary heart failure, and myocardial infarction. The warning in regard to red blood cell count did not warn patients and their physicians that hematocrit levels can rise by as much as 10% above normal range, nor did it warn of the serious and life threatening risks that are associated with a red blood cell count that exceeds 50%, including the fact that individuals with a hematocrit greater than or equal to 51% have a doubling of the risk of stroke, new-onset heart failure, and coronary heart disease.

98.    Although the prescribing information and medication guide contained within the package materials instructed physicians to re-evaluate their patient's hematocrit 3 to 6 months after starting treatment, they failed to warn patients and their physicians that the product can cause dangerous increases in hematocrit much more rapidly, and also failed to instruct physicians to monitor their patient's hematocrit more frequently.

99.    The prescribing information and medication guide contained within the package materials failed to state that testosterone replacement therapy should not be administered to men who have an underlying inherited trait which increases their risk of blood clotting, such as the Factor V Leiden mutation, the Prothrombin gene mutation, high Factor VIII, high homocysteine, or the lupus anticoagulant, because the increase in serum estradiol caused by the drug can interact with the underlying clotting trait to produce blood clots in the legs, the lungs, the eyes, the brain, and the bones. They also fail to instruct physicians to screen all patients for underlying clotting traits before prescribing testosterone replacement therapy.

25

100.    Although the prescribing information and medication guide contained within the package materials warned that use of the product may result in risk of blood clots in the veins, they specifically limit this warning to "blood clots in the legs" and only warn against blood clots in the legs that form as a result of increased red blood cell count (polycythemia). There is no warning for blood clots in the veins other than "blood clots in the legs," nor is there any warning of blood clots resulting from causes other than polycythemia. Also, there are no warnings that blood clots in veins as a consequence of polycythemia could result in pulmonary embolism, or other injuries secondary to the formation of deep vein thrombosis in the legs or other parts of the body.

101.    The prescribing information and medication guide contained within the package materials failed to warn that use of the product may result in elevated levels of estradiol. They did not instruct physicians to monitor estradiol levels, nor did they provide any guidance to physicians or patients regarding the significant health risks associated with elevated levels of serum estradiol in men, including the fact that there was a two-fold excess risk of stroke for men who had serum estradiol levels in the top quintile versus those men whose estradiol levels were lower, and that estradiol blood levels greater than 34.1 pg/mL resulted in more than doubling of stroke incidence in men. There was also no warning that elevated serum estradiol levels resulting from use of the product can cause impairment of contractility of the heart.

102.    The prescribing information and medication guide contained within the package materials did not warn that use of the product may result in the formation of deep vein thrombosis, pulmonary embolism, stroke, infarction, coronary heart failure, cardiovascular disease, or myocardial infarction caused by elevated levels of estradiol.

26

103.    The prescribing information and medication guide contained within the package materials did not offer any warning of the very serious health risks for men over the age of 65 who use testosterone replacement therapy. There was no mention of the fact that there is a doubling of the risk of heart attacks in men over the age of 65 who use testosterone replacement therapy, despite the fact that the data supporting this finding has been available for years. Instead, the label only stated that the manufacturer lacks any information regarding the safety or efficacy of testosterone therapy for men over the age of 65. This absence of a warning failed to adequately advise and instruct patients and their physicians of the very serious health risks caused by the use of testosterone in this patient population.

104.    In November of 2013, Rebecca Vigen, Colin I. O'Donnell, Anna E. Barón, Gary K. Grunwald, et al. published an article in the Journal of the American Medical Association entitled Association of Testosterone Therapy with Mortality, Myocardial Infarction, and Stroke in Men with Low Testosterone Levels ("Vigen Paper").

105.    The Vigen Paper concluded that: "Use of testosterone therapy in this cohort of veterans with significant medical comorbidities was associated with increased risk of mortality, MI, or ischemic stroke." In fact, testosterone therapy increased the risk of death, heart attack, and stroke by approximately 30%.

106.    On January 29, 2014, William D. Finkle, Sander Greenland, Gregory K. Ridgeway, John L. Adams, et al. published an article in PLOS ONE entitled Increased Risk of Non-Fatal Myocardial Infarction Following Testosterone Therapy Prescription in Men ("Finkle Paper").

107.    The Finkle Paper demonstrated an increased risk of heart attack in men over age 65 years, and in men younger than 65 years with a prior history of heart disease.

27

108. The increased incidence of heart attack and stroke was foreseeable at the time of the product launch of Fortesta and Androderm.

109. Other studies and additional medical evidence, as described herein, indicate that the use of testosterone increases the risk of thromboembolic events, such as deep vein thrombosis ("DVT"), pulmonary embolism ("PE"), venous sinus thrombosis ("VST"), and other thrombotic events.

110. On June 19, 2014, and in response to post-market reports of venous blood clots unrelated to polycythemia in testosterone users, the United States Food & Drug Administration ("FDA") announced that it was requiring manufacturers of testosterone to include a general warning in the drug labeling of all approved testosterone products about the risk of venous thromboembolism ("VTE"), including deep vein thrombosis ("DVT") and pulmonary embolism ("PE").

.

## FDA adding general warning to testosterone products about potential for venous blood clots

[06/19/2014] The U.S. Food and Drug Administration (FDA) is requiring manufacturers to include a general warning in the drug labeling of all approved testosterone products about the risk of blood clots in the veins. Blood clots in the veins, also known as venous thromboembolism (VTE), include deep vein thrombosis (DVT) and pulmonary embolism (PE). The risk of venous blood clots is already included in the labeling of testosterone products as a possible consequence of polycythemia, an abnormal increase in the number of red blood cells that sometimes occurs with testosterone treatment. Because there have been postmarket reports of venous blood clots unrelated to polycythemia, FDA is requiring a change to drug labeling of all testosterone products to provide a more general warning regarding venous blood clots and to ensure this risk is described consistently in the labeling of all approved testosterone products.

Because these clots occur in the veins, this new warning is not related to FDA's ongoing evaluation of the possible risk of stroke, heart attack, and death in patients taking testosterone products. We are currently evaluating the potential risk of these cardiovascular events, which are related to blood clots in the arteries and are described in the Drug Safety Communication posted on January 31, 2014.

Testosterone products are FDA-approved for use in men who lack or have low testosterone levels in conjunction with an associated medical condition. Examples of these conditions include failure of the testicles to produce testosterone for reasons such as genetic problems or chemotherapy.

111. As a result of this mandate by the FDA, on June 21, 2014, the Defendants updated the prescribing information to provide the general warning required by the FDA regarding DVT

and PE, and also updated the medication guide for Fortesta and Androderm to include the significant risk of PE as follows: "Blood clots in the legs <u>or lungs</u>. Signs and symptoms of a blood clot in your leg can include leg pain, swelling, or redness. Signs and symptoms of a blood clot in your lungs can include difficulty breathing or chest pain."

112.    However, the prescribing information and the medication guide contained within the package materials still lacks any warning about the risks of elevated estradiol levels and the need to screen for underlying clotting traits, and they contain no warnings for strokes, or for cardiovascular injuries.

113.    The marketing and promotion of the product to patients and physicians overstated its benefits by creating the impression that it was a safe and effective treatment for a variety of aging-related conditions and symptoms, for which it was not FDA approved. This is misleading and fails to adequately warn physicians and patients about the numerous, life-threatening health risks associated with use of the drug.

114.    As a result of Defendants' advertising and marketing, and representations about its product, men in the United States pervasively seek out prescriptions for testosterone replacement therapy.

115.    Had Plaintiff and his physician(s) known about the risks and dangers associated with the Defendants testosterone replacement therapy products (Fortesta and Androderm), as described herein, Plaintiff's physician would not have prescribed nor would Plaintiff have used Fortesta and/or Androderm. Consequently, Plaintiff would not have been subject to its serious side effects, and/or Plaintiff's physicians would have adequately monitored Plaintiff's hematocrit and estradiol levels, and, as a result, Plaintiff's injuries would have not have occurred.

## FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

116.    Decedent, Lynn Darryl Anderson, was prescribed Fortesta and Androderm and used these drugs as directed from approximately August 2012 until January 21, 2013

117.    Decedent was sixty- seven (67) years of age when he was prescribed and started using testosterone replacement therapy for symptoms he attributed to low testosterone.

118.    In keeping with his proactive lifestyle, Decedent agreed to initiate testosterone treatment with Fortesta.

119.    Decedent suffered an acute ischemic stroke on September 9, 2012 resulting in his death on January 21, 2013.

120.    Had Defendants properly disclosed the risks associated with testosterone, Decedent would have avoided the stroke risk by either not using testosterone at all, severely limiting the dosage and length of use, and/or by closely monitoring the degree to which the drugs were adversely affecting his health.

121.    Decedent Lynn Darryl Anderson was unaware of and did not discover that his acute ischemic stroke could be caused by the use of testosterone replacement therapy prior to his death on January 21, 2013.

122.    As alleged herein, as a direct, proximate, and legal result of Defendants' negligence and wrongful conduct, and the unreasonably dangerous and defective characteristics of the drug testosterone, Decedent died prematurely. Plaintiff has suffered economic loss, including incurring significant expenses for medical care and funeral expenses. Plaintiffs have suffered a loss of society and consortium due to the premature death of their son, husband, and father.

## FIRST CAUSE OF ACTION
### Strict Product Liability - Defective Manufacturing

123.    Plaintiff incorporates by reference herein each of the allegations heretofore set forth in this Complaint as though fully set forth herein and further alleges as follows.

124.    Defendants are the manufacturers, designers, distributors, sellers, or suppliers of the prescription testosterone replacement therapy products used by Decedent.

125.    The testosterone replacement therapy manufactured, designed, sold, distributed, supplied, and/or placed in the stream of commerce by Defendants were defective in their manufacture and construction as described herein at the time they left the Defendants' control.

126.    As a direct and proximate result of Decedent's use of prescription testosterone replacement therapy products as manufactured, designed, sold, supplied, and introduced into the stream of commerce by Defendants, Decedent Lynn Darryl Anderson, suffered a fatal ischemic stroke.    Had the Defendants' warned of this risk, Decedent's physician would not have prescribed prescription testosterone replacement therapy products to the Decedent, and he would not have died.    Thus, the Defendants' failure to warn was a legal cause of Decedent's death and the damages claimed herein.

127.    As a result of Defendants' negligence and wrongful conduct, and the unreasonably dangerous and defective characteristics of the drug testosterone, Plaintiffs have suffered, without limitation, the following losses: (a) loss of financial support of Decedent; (b) medical and funeral expenses paid on behalf of Decedent; (c) future loss of Decedent's society, support and services; (d) loss of Decedent's affection, comfort, counsel and advice; (e) lost companionship, care and solicitude; and (f) mental pain and suffering from the date of injury.

31

## SECOND CAUSE OF ACTION
### Strict Product Liability - Design Defect

128.    Plaintiff incorporates by reference herein each of the allegations heretofore set forth in this Complaint as though fully set forth herein and further alleges as follows.

129.    Defendants are the manufacturers, designers, distributors, sellers, and/or suppliers of prescription testosterone replacement therapy products Fortesta and Androderm used by the Decedent herein.

130.    The prescription testosterone replacement therapy products manufactured, designed, sold, distributed, supplied, and/or placed in the stream of commerce by Defendants were defective in their design such that they were unreasonably dangerous, were not fit for the ordinary purpose for which they were intended, and/or did not meet the reasonable expectations of an ordinary consumer.

131.    At the time Defendants manufactured, designed, distributed, sold, and/or supplied the prescription testosterone replacement therapy products into the stream of commerce, safer, more practical, alternative methods for treating alleged symptoms of "low testosterone" were available.

132.    The prescription testosterone replacement therapy products manufactured, designed, sold, distributed, supplied, and/or placed in the stream of commerce by Defendants were defective in design as described herein at the time they left Defendants' control.

133.    As a direct and proximate result of Decedent's use of Fortesta and Androderm as manufactured, designed, sold, supplied, and/or introduced into the stream of commerce by Defendants, and as a direct and proximate result of the defective nature of Defendants' Fortesta and Androderm, Decedent Lynn Darryl Anderson, suffered a fatal acute ischemic stroke. Had the Defendants' warned of this risk, Decedent's physician would not have prescribed

32

prescription testosterone replacement therapy products to the Decedent, and he would not have died. Thus, the Defendants' failure to warn was a legal cause of Decedent's death and the damages claimed herein.

134.    As a result of Defendants' negligence and wrongful conduct, and the unreasonably dangerous and defective characteristics of the prescription testosterone replacement therapy products, Plaintiffs have suffered, without limitation, the following losses: (a) loss of financial support of Decedent; (b) medical and funeral expenses paid on behalf of Decedent; (c) future loss of Decedent's society, support and services; (d) loss of Decedent's affection, comfort, counsel and advice; (e) lost companionship, care and solicitude; and (f) mental pain and suffering from the date of injury.

## THIRD CAUSE OF ACTION
### Strict Liability – Failure To Warn

135.    Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows.

136.    The prescription testosterone replacement therapy products manufactured and/or supplied by Defendants were defective due to inadequate warnings or instructions because Defendants knew or should have known that the products created significant risks of serious bodily harm to consumers, and they failed to adequately warn consumers and/or their health care providers of such risks.

137.    The prescription testosterone replacement therapy products manufactured and/or supplied by Defendants were defective due to inadequate post-marketing warnings or instructions because, after Defendants knew or should have known of the risk of serious bodily harm from the use of prescription testosterone replacement therapy products Defendants failed to

33

provide an adequate warning to consumers and/or their health care providers of the product, knowing the product could cause serious injury.

138.   As a direct and proximate result of Decedent, Lynn Darryl Anderson's reasonably anticipated use of Fortesta and Androderm as manufactured, designed, sold, supplied, marketed and/or introduced into the stream of commerce by Defendants, Decedent Lynn Darryl Anderson, suffered a fatal acute ischemic stroke. Had the Defendants' warned of this risk, Decedent's physician would not have prescribed Fortesta or Androderm to the Decedent, and he would not have died. Thus, the Defendants' failure to warn was a legal cause of Decedent's death and the damages claimed herein.

139.   As a result of Defendants' negligence and wrongful conduct, and the unreasonably dangerous and defective characteristics of the drug testosterone, Plaintiffs have suffered, without limitation, the following losses: (a) loss of financial support of Decedent; (b) medical and funeral expenses paid on behalf of Decedent; (c) future loss of Decedent's society, support and services; (d) loss of Decedent's affection, comfort, counsel and advice; (e) lost companionship, care and solicitude; and (f) mental pain and suffering from the date of injury.

## FOURTH CAUSE OF ACTION
### Negligence

140.   Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows.

141.   At all times herein mentioned, Defendants had a duty to properly manufacture, design, formulate, compound, test, produce, process, assemble, inspect, research, distribute, market, label, package, distribute, prepare for use, sell, prescribe and adequately warn of the risks and dangers of Fortesta and Androderm.

34

142. At all times herein mentioned, Defendants negligently and carelessly manufactured, designed, formulated, distributed, compounded, produced, processed, assembled, inspected, distributed, marketed, labeled, packaged, prepared for use and sold Fortesta and Androderm and failed to adequately test and warn of the risks and dangers of these prescription testosterone replacement therapy products.

143. Despite the fact that Defendants knew or should have known that Fortesta and Androderm caused unreasonable, dangerous side effects, Defendants continued to market these prescription testosterone replacement therapy products to consumers including Decedent Lynn Darryl Anderson, when there were safer alternative methods of treating loss of energy, libido erectile dysfunction, depression, loss of muscle mass and other conditions Fortesta's and Androderm's advertising claims are caused by low testosterone.

144. Defendants knew or should have known that consumers such as Decedent Lynn Darryl Anderson would foreseeably suffer injury as a result of Defendants' failure to exercise ordinary care as described above.

145. Defendants' negligence was a proximate cause of Decedent Lynn Darryl Anderson's fatal acute ischemic stroke. Had the Defendants' warned of this risk, Decedent's physician would not have prescribed Fortesta or Androderm to the Decedent, and he would not have died. Thus, the Defendants' failure to warn was a legal cause of Decedent's death and the damages claimed herein.

146. As a result of Defendants' negligence and wrongful conduct, and the unreasonably dangerous and defective characteristics of the drug testosterone, Plaintiff has suffered, without limitation, the following losses: (a) loss of financial support of Decedent; (b) medical and funeral expenses paid on behalf of Decedent; (c) future loss of Decedent's society,

support and services; (d) loss of Decedent's affection, comfort, counsel and advice; (e) lost companionship, care and solicitude; and (f) mental pain and suffering from the date of injury.

## FIFTH CAUSE OF ACTION
### Negligent Misrepresentation

147.    Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows.

148.    Defendants, from the time that Fortesta and Androderm was first manufactured, marketed and distributed, and up to the present, made false misrepresentations, as previously set forth herein, to Decedent, Decedent's physicians and the general public, including but not limited to, the misrepresentation that prescription testosterone replacement therapy products were safe, fit and effective for human consumption. At all times herein mentioned Defendants conducted a sale and marketing campaign to promote the sale of Fortesta and Androderm and willfully deceive Decedent, Decedent's physicians and the general public as to the health risks and consequences of the use of prescription testosterone replacement therapy products.

149.    Defendants made the foregoing representation without any reasonable ground for believing them to be true. These representations were made directly by Defendants, by sales representatives and other authorized agents of said Defendants, and in publications and other written materials directed to physicians, medical patients and the public, with the intention of inducing reliance and the prescription, purchase and use of Fortesta and Androderm.

150.    The foregoing representations by Defendants, were in fact false, in that Fortesta and Androderm were not safe, fit and effective for human consumption, the use of prescription testosterone replacement therapy products is hazardous to health, and has a serious propensity to cause serious injuries to users, including but not limited to, the injuries suffered by Decedent as delineated herein.

151. The foregoing representations by Defendants were made with the intention of inducing reliance and the prescription, purchase and use of prescription testosterone replacement therapy products.

152. In reliance on the misrepresentations by Defendants, Decedent was induced to purchase and use Fortesta and Androderm. If Decedent had known the true facts and the facts concealed by Defendants, Decedent would not have used Fortesta. The reliance of Decedent upon Defendants' misrepresentations was justified because such misrepresentations were made and conducted by individuals and entities that were in a position to know the true facts.

153. As a direct and proximate result of Defendants' conduct, Decedent Lynn Darryl Anderson died from an acute ischemic stroke. Had the Defendants' warned of this risk, Decedent's physician would not have prescribed Fortesta or Androderm to the Decedent, and he would not have died. Thus, the Defendants' failure to warn was a legal cause of Decedent's death and the damages claimed herein.

154. As a result of Defendants' negligence and wrongful conduct, and the unreasonably dangerous and defective characteristics of the drug testosterone, Plaintiff has suffered, without limitation, the following losses: (a) loss of financial support of Decedent; (b) medical and funeral expenses paid on behalf of Decedent; (c) future loss of Decedent's society, support and services; (d) loss of Decedent's affection, comfort, counsel and advice; (e) lost companionship, care and solicitude; and (f) mental pain and suffering from the date of injury.

## SIXTH CAUSE OF ACTION
### Breach Of Implied Warranty

155. Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows.

156. Prior to the time that the aforementioned products were used by Decedent, Defendants impliedly warranted to Decedent and Decedent's agents and physicians that Fortesta and Androderm was of merchantable quality and safe and fit for the use for which it was intended.

157. Decedent was and is unskilled in the research, design and manufacture of the products and reasonably relied entirely on the skill, judgment and implied warranty of the Defendants in using Fortesta and Androderm.

158. Fortesta and Androderm was neither safe for its intended use nor of merchantable quality, as warranted by Defendants, in that Fortesta and Androderm have dangerous propensities when used as intended and will cause severe injuries to users.

159. As a result of the above-mentioned breach of implied warranties by Defendants, Decedent Lynn Darryl Anderson died from an acute ischemic stroke. Had the Defendants' warned of this risk, Decedent's physician would not have prescribed Fortesta or Androderm to the Decedent, and he would not have died. Thus, the Defendants' failure to warn was a legal cause of Decedent's death and the damages claimed herein.

160. As a result of Defendants' negligence and wrongful conduct, and the unreasonably dangerous and defective characteristics of the drug testosterone, Plaintiffs have suffered, without limitation, the following losses: (a) loss of financial support of Decedent; (b) medical and funeral expenses paid on behalf of Decedent; (c) future loss of Decedent's society, support and services; (d) loss of Decedent's affection, comfort, counsel and advice; (e) lost companionship, care and solicitude; and (f) mental pain and suffering from the date of injury.

## SEVENTH CAUSE OF ACTION
### Breach Of Express Warranty

161.   Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows.

162.   At all times mentioned, Defendants expressly represented and warranted to Plaintiff and Plaintiff's agents and physicians, by and through statements made by Defendants or their authorized agents or sales representatives, orally and in publications, package inserts and other written materials intended for physicians, medical patients and the general public, that prescription testosterone replacement therapies, such as Fortesta and Androderm are safe, effective, fit and proper for its intended use. Plaintiff purchased Fortesta and Androderm relying upon these warranties.

163.   In utilizing Fortesta and Androderm Decedent relied on the skill, judgment, representations, and foregoing express warranties of Defendants. These warranties and representations were false in that Fortesta and Androderm are unsafe and unfit for their intended uses.

164.   As a result of the above-mentioned breach of express warranties by Defendants, Decedent Lynn Darryl Anderson died from an acute ischemic stroke. Had the Defendants' warned of this risk, Decedent's physician would not have prescribed Fortesta or Androderm to the Decedent, and he would not have died. Thus, the Defendants' failure to warn was a legal cause of Decedent's death and the damages claimed herein.

165.   As a result of Defendants' negligence and wrongful conduct, and the unreasonably dangerous and defective characteristics of the drug testosterone, Plaintiff has suffered, without limitation, the following losses: (a) loss of financial support of Decedent; (b) medical and funeral expenses paid on behalf of Decedent; (c) future loss of Decedent's society,

support and services; (d) loss of Decedent's affection, comfort, counsel and advice; (e) lost companionship, care and solicitude; and (f) mental pain and suffering from the date of injury.

## EIGHTH CAUSE OF ACTION
### Breach of Implied Warranty of Merchantability

166. Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows.

167. Defendants knew, or in the exercise of reasonable care should have known, that Fortesta was not reasonably safe as designed, manufactured, tested, marketed and distributed.

168. Defendants knew that Fortesta and Androderm carried the increased risk of serious adverse events, including thrombotic injuries such as blood clots, pulmonary emboli, and strokes.

169. Defendants' actions, representations, and/or omissions violate Utah Code Ann. § 70A-2-314 which requires a merchant to carry an implied warranty of merchantability.

170. By reason of the foregoing, Decedent Lynn Darryl Anderson died from an acute ischemic stroke. Had the Defendants' warned of this risk, Decedent's physician would not have prescribed Fortesta and Androderm to the Decedent, and he would not have died. Thus, the Defendants' failure to warn was a legal cause of Decedent's death and the damages claimed herein.

171. As a result of Defendants' negligence and wrongful conduct, and the unreasonably dangerous and defective characteristics of the drug testosterone, Plaintiffs have suffered, without limitation, the following losses: (a) loss of financial support of Decedent; (b) medical and funeral expenses paid on behalf of Decedent; (c) future loss of Decedent's society, support and services; (d) loss of Decedent's affection, comfort, counsel and advice; (e) lost companionship, care and solicitude; and (f) mental pain and suffering from the date of injury.

## NINTH CAUSE OF ACTION
**Fraud and Deceit**

172.    Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows.

173.    Defendants, from the time that Fortesta and Androderm were first manufactured, marketed and distributed, and up to the present, willfully misrepresented, omitted material facts and deceived Plaintiff by concealing from the Plaintiff, Plaintiff's physicians and the general public, the true facts concerning Fortesta and Androderm, which Defendants, as manufacturer, maker and distributor of the products, had a duty to disclose.

174.    Defendants knew that Fortesta and Androderm increased risk for serious thrombotic adverse events.

175.    At all times herein mentioned Defendants conducted sales and marketing campaigns to promote the sale of Fortesta and Androderm and willfully deceive Decedent, Decedent's physicians and the general public as to the health risks and consequences of the use of Fortesta and Androderm. Defendants were aware of the foregoing, and that Fortesta and Androderm were not fit and effective for human consumption, the use of Fortesta and Androderm was hazardous to health, and Fortesta and Androderm had a serious propensity to cause serious injuries to users, including but not limited to, the injuries suffered by Plaintiff.

176.    Defendants intentionally misrepresented and omitted material facts, and concealed and suppressed the true facts concerning Fortesta and Androderm with the intent to defraud Plaintiff, in that Defendants knew that Plaintiff's physicians would not prescribe Fortesta and Androderm and Decedent would not have used Fortesta or Androderm if he was aware of the true facts concerning the dangers of prescription testosterone replacement therapies.

41

177.    Defendants made the above representations, which were untrue and known to be untrue or recklessly made such misrepresentations, omitted material facts, knowing they were material, concerning the increased risks of serious thrombotic events; the misrepresentations and omissions of material fact were done by Defendants with intent to deceive potential users of Fortesta including Decedent, which was done for the purpose of having potential users of Fortesta including Decedent, act upon the misleading information or lack thereof, and Decedent did in fact, rely on such misrepresentations or omissions by Defendants and Decedent was induced thereby to act thereon in taking Fortesta and Androderm which caused Decedent to suffer an acute ischemic stroke resulting in his premature death.  As a result of the foregoing willful, intentional, fraudulent misrepresentations, omissions of material fact and deceitful conduct by Defendants, Plaintiff suffered injuries and damages as alleged herein and is entitled to punitive damages from Defendant.

### TENTH CAUSE OF ACTION
**Violation of Utah Consumer Sales Practice Act**

178.    Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows.

179.    Plaintiff brings this cause of action pursuant to Utah Consumer Sales Practices Act and respectfully requests that the Court award all appropriate remedies provided in the prayer.

180.    The Utah Consumer Sales Practices Act provides as follows:
This act shall be construed liberally to promote the following policies:

. .

(1)    protect consumers from suppliers who commit deceptive and unconscionable sales practices;

(13-11-2)

\* \* \*

(1)   A deceptive act or practice by a supplier in connection with a consumer transaction violates this chapter whether it occurs before, during, or after the transaction.

(2)   Without limiting the scope of Subsection (1), a supplier commits a deceptive act or practice if the supplier knowingly or intentionally:

(a)   indicates that the subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses or benefits, if it has not;

(13-11-4)

\* \* \*

(1)   In determining whether an act or practice is unconscionable, the court shall consider circumstances, which the supplier knew or had reason to know.

(13-11-5)

\* \* \*

(1)   Whether he seeks or is entitled to damages or otherwise has an adequate remedy at law, a consumer may bring an action to:

a.   obtain a declaratory judgment that an act or practice violates this chapter; and

b.   enjoin, in accordance with the principles of equity, a supplier who has violated, is violating, or is likely to violate this chapter.

(2)   A consumer who suffers loss as a result of a violation of this chapter may recover, but not in a class action, actual damages or $2,000, whichever is greater, plus court costs.

(13-11-19)

181.   The acts and practices described in Paragraphs 1 through 177 above constitute a deceptive act or practice and/or an unconscionable act or practice by Defendants, and thus, violates the Utah Consumer Sales Practice Act, in the following particulars, among others:

43

a.   Representing to Decedent, Decedent's physicians and the general public that Fortesta and Androderm was safe, fit and effective for human consumption, knowing that said representations were false, and concealing from the Decedent, Decedent's physicians and the general public that said products had a serious propensity to cause injuries to users;

b.   Engaging in advertising programs designed to create the image, impression and belief by consumers, physicians that the use of Fortesta and Androderm was safe for human use, constituted a convenient, safe form of hormone replacement and would not interfere with daily life, even though Defendants knew these to be false, and even though Defendants had no reasonable grounds to believe them to be true;

c.   Purposely downplaying and understating the health hazards and risks associated with Fortesta and Androderm;

d.   Issuing promotional literature deceiving potential users of Fortesta and Androderm by relaying positive information, including testimonials from satisfied users, and manipulating statistics to suggest widespread acceptability, while downplaying the known adverse and serious health effects and concealing material relevant information regarding the safety of said products.

182.   The violation of the Utah Consumers Sales Practices Act by Defendants, as described above, represents a continuing threat to members of the public in that Defendants continue to engage in the conduct described therein.

183.   Plaintiff, pursuant to the Utah Consumer Sales Practices Act, seeks an order of this court that the acts or practices of Defendants violate this law and Defendants are enjoined, in

44

accordance with the principles of equity, from violating this law, and, further, that Plaintiff is entitled to her actual damages or $2,000, whichever is greater, plus court costs.

## ELEVENTH CAUSE OF ACTION
### Punitive Damages

184. Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows.

185. Plaintiff alleges Defendants engaged in intentional, willful, wanton, and reckless conduct with conscious disregard for the safety of consumers including Decedent in the following particulars:

a. Defendants researched, designed, formulated, compounded, tested, manufactured, produced, processed, assembled, inspected, distributed, marketed, labeled, promoted, packaged, and/or advertised Fortesta and Androderm with knowledge that it was a dangerously defective product;

b. Defendants failed to conduct, either directly or indirectly, adequate testing of Fortesta and Androderm for thrombotic events after becoming aware of the increased incidence of such effects in those taking Fortesta and Androderm;

c. Defendants failed to adequately warn consumers and their treating physicians of the adverse health hazards caused by using Fortesta and Androderm;

d. Defendants falsely and fraudulently misrepresented in its advertising, promotional materials and other materials, among other things, the safety of using Fortesta and Androderm;

e.     Defendants knowingly omitted, suppressed or concealed material facts about the unsafe and defective nature of Fortesta and Androderm from the medical community and/or the consuming public;

f.     Defendants made the above representations, which were untrue and known to be true or recklessly made such misrepresentations, omitted material facts, knowing they were material, concerning the increased risks of serious thrombotic events. Decedent did in fact, rely on such misrepresentations or omissions by Defendants and Decedent was induced thereby to act thereon in taking Fortesta and Androderm which caused Decedent to suffer an acute ischemic stroke resulting in his premature death;

g.     Defendants' actions justify an award of punitive damages;

h.     Defendants acted negligently in marketing and selling Fortesta and Androderm and failing to timely remove it from the market;

i.     Defendants' actions constitute the production and sale of a defective and unreasonably dangerous product, a violation of Section 402A of the Restatement (Second) of Torts;

j.     Defendants' actions constitute negligence in the design and/or testing of Fortesta and Androderm, including negligent failure to warn;

k.     Defendants failed to exercise reasonable care in designing, manufacturing and/or marketing Fortesta and Androderm to the public, including Decedent Lynn Darryl Anderson; and

46

l.    Defendants delayed in informing Decedent of the increased thrombotic risks of taking Fortesta and Androderm, and thus, precluded Decedent from making an informed decision on whether or not to use Fortesta and Androderm, and thus, caused serious injury.

186.    Based on information and belief, Defendants actually knew of Fortesta's and Androderm's defective nature but continued to design, manufacture, market and sell Fortesta and Androderm so as to maximize sales and profits at the expense of the public health and safety, in conscious disregard of the foreseeable harm caused by Fortesta and Androderm.

187.    Defendants' conduct in the license, design, manufacturing, assembly, packaging, warning, marketing, advertising, promotion, distribution and sale of Fortesta and Androderm enclosed fraudulent, knowing misconduct, and/or conduct undertaken recklessly and with conscious disregard for the safety of consumers such as Decedent herein, constitute despicable conduct, an oppression, fraud and malice, and such conduct was at all times relevant hereto ratified by the corporate Defendants herein, thereby entitling Plaintiff to punitive damages in an amount appropriate to punish and set an example of Defendants.

## PRAYER FOR RELIEF

The unlawful acts and practices described above were a legal cause of Decedent's death and the damages in this lawsuit. Therefore, Plaintiff, on behalf of Decedent's Estate, seeks all damages available under Utah law including, without limitation,

A.    Loss of financial support of Decedent;

B.    Medical and funeral expenses paid on behalf of Decedent;

C.    Future loss of Decedent's society, support and services;

D.    Loss of Decedent's affection, comfort, counsel and advice;

47

E.   Lost companionship, care and solicitude;

F.   Mental pain and suffering from the date of injury.

G.   Punitive and exemplary damages in an amount to be determined at trial;

H.   Prejudgment and post judgment interest;

I.   Attorneys' fees and costs to bring this action; and

J.   Such other and further relief as the court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all counts and as to all issues.

Dated: January 20, 2015.                    Respectfully submitted,

                                            Nancy A. Mismash, 6615
                                            Robert J DeBry & Associates
                                            4252 South 700 East
                                            Salt Lake City, UT 84107
                                            (801) 262-8915
                                            Email: nmismash@robertdebry.com

Of Counsel for Plaintiffs:
Calvin S. Tregre, Jr.
**BURG SIMPSON ELDREDGE HERSH & JARDINE, P.C.**
312 Walnut Street, Suite 2090
Cincinnati, OH 45202
Phone: (513) 852-5600
ctregre@burgsimpson..com
**Attorneys for Plaintiffs**